**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA

vs.                                                    3:06-cr-92-J-20MCR

TERRENCE TUCKER

_____

## REPORT AND RECOMMENDATION[1]

**THIS CAUSE** is before the Court on Defendant's Amended Motion to Suppress

Evidence (Doc. 33) filed April 20, 2006.[2]  The government filed a response in opposition

to the Motion on April 13, 2006 (Doc. 22).  An evidentiary hearing was held before the

undersigned on April 26, 2006.

## I.  Evidence Presented at the Hearing

During the hearing, the government presented the testimony of three law

enforcement officers from the Jacksonville Sheriff's Office: Detective Charles Bates,

Patrol Officer David Border and Officer Edward R. Sullivan.  First, Detective Bates of the

Narcotics Division of the Jacksonville Sheriff's Office testified that back in January 2006,

_____

[1]  Specific, written objections may be filed in accordance with 28 U.S.C. § 636 and Rule 6.02, Local Rules, United States District Court, Middle District of Florida, within ten (10) days after service of this document.  Failure to file timely objections shall bar the party from a de novo determination by a district judge and from attacking factual findings on appeal.

[2]  Defendant originally filed a Motion to Suppress (Doc. 20) on April 13, 2006.  The Court set an evidentiary hearing for April 19, 2006.  At the hearing, Defendant asked for a continuance as he had been given a copy of the videotape of the traffic stop only that morning.  The Court granted the continuance and permitted Defendant to file an amended motion to suppress. Defendant did so and confirmed on the record that the Second Motion to Suppress (Doc. 30) was actually an amended motion to suppress and was taking the place of his original motion.

he was involved in an investigation into a potential cocaine distribution network.  From a

confidential informant, he learned that a known cocaine dealer, Christopher Lowe, was

selling considerable amounts of cocaine.  (Tr. 8:4-8).[3]  Based on information provided

by the confidential informant, Detective Bates obtained a list of individuals involved in

the drug transactions and was also able to seize some of Mr. Lowe's cocaine.  (Tr. 8:24-

25, 9:13-16).  The confidential informant told Detective Bates numerous locations where

Mr. Lowe received his cocaine.  One location was a residence on 118th Street in

Jacksonville, Florida.  (Tr. 11:4-11).  Detective Bates conducted surveillance at this

residence and was able to observe the vehicles parked in front of the home, a blue Ford

Expedition and a Jaguar.  (Tr. 11:9-25, 12:1-2).  Detective Bates also learned that the

home was owned by a Terrence Tucker and his wife.  (Tr. 12:7-12).  Detective Bates

was aware of all of this information prior to the events occurring on January 24, 2006.

On January 24, 2006, Detective Bates and a DEA Task Force Officer, Donald

Nixon, were conducting surveillance at a hotel located on Skinner Lake Drive.  The

confidential informant had told the detectives that after the seizure of some of his

cocaine, Mr. Lowe had ceased operating out of his home and was conducting drug

transactions out of a hotel room.  (Tr. 10:22-25, 11:1-3).  The detectives were located in

a parking lot adjacent to the hotel and from their vantage point were able to observe the

parking lot of the hotel and individuals entering and exiting the hotel.  (12:23-25, 13:1-4).

The detectives observed a car they believed belonged to Mr. Lowe.  The detectives saw

---

[3]  References to the transcript of the evidentiary hearing conducted on April 26, 2006, will
be "Tr. Page number : line number(s)."

Mr. Lowe enter a hotel room.  (Tr. 13:5-7).  Later that day, they observed another known

drug dealer, Lonnie Lewis, enter the same hotel room Mr. Lowe had entered.  (Tr 13:19-

23).  The detectives also observed the Defendant in this case, Terrence Tucker, arrive

at the hotel in a blue Expedition and enter the same hotel room both Mr. Lowe and Mr.

Lewis had entered.  (Tr. 13:18-19, 14:23-25, 15:1-10).  The detectives observed Mr.

Lewis leaving the hotel room and shortly thereafter, the Defendant left the room carrying

a backpack.  (Tr. 17:3-8).

Detective Bates testified that he became suspicious that the backpack contained

drugs and he and Task Force Officer Nixon decided to follow Defendant.  (Tr. 21:1-5).

As they were following him, Defendant apparently suspected he was being followed as

he began to take what Detective Bates felt were evasive measures (Defendant began

speeding up to approximately 85 miles/hour and would act as if he were going to exit

the freeway and then cut back over to the left lane).  (Tr. 19:20-23).  As Detective Bates

and Officer Nixon were in an unmarked vehicle, Detective Bates radioed the

Jacksonville Sheriff's Office dispatch to attempt to get a marked vehicle to pull

Defendant over.  (Tr. 21:6-12).  Accordingly, Detective Bates asked for a patrol car to

attempt to get probable cause to stop the vehicle.  (Tr. 23:2-6).  Patrol Officer David

Border responded to the dispatcher's request for an available officer.  Officer Border

testified that he heard the description of the vehicle and waited on the entrance ramp to

295 until he observed the vehicle approaching.  (Tr. 76:22-25).  After he saw the blue

Expedition, he attempted to catch up to the vehicle and proceeded to "pace" the vehicle

for approximately 1/8 of a mile.  (Tr. 77:1-18).  He determined the vehicle was traveling

at 71 miles per hour in a 65 mph zone and therefore believed he had probable cause to stop the vehicle for violation of a traffic regulation.  (Tr. 77:19-25, 78:1-3).

Officer Border's vehicle was equipped with a dashboard camera which recorded the events.  The tape was played during the hearing.  The tape shows Officer Border speeding to catch up with the blue Expedition and then following behind the vehicle for a short period of time before the Expedition begins to slow down and exit the highway. Officer Border testified that he checks the accuracy of his radar twice each day and that he tested it the day of January 24, 2006.  (Tr. 71:20-24, 72:8-9).  Officer Border also testified that his radar and vehicle are calibrated often.  (Tr. 72:13-17).  The radar was last calibrated in October 2005.  Id.  Officer Border stated that it was standard procedure for him to maintain approximately 100 to 150 feet between his vehicle and the vehicle he was trying to pace.  (Tr. 4-18).  While watching the tape, Officer Border testified he believed he was probably 100 and no more than 150 feet behind Defendant's vehicle while he was pacing it.  (Tr. 93:2-3).  Officer Border also confirmed that it was not unusual for him to pace a vehicle while there were other vehicles in between his car and the car he was pacing.  (Tr. 93:10-18, 23-25; 94:1-3).  After determining Defendant's speed, Officer Border followed the Expedition off the highway and turned on his lights and siren.  The Expedition pulled over in a strip mall parking lot and Officer Border directed Defendant to exit his vehicle.  (Tr. 80:6-12, 81:7-9).

The tape indicates that Defendant exited his vehicle at 12:44 p.m.[4]  Shortly after exiting his vehicle, Detective Bates asked Defendant from where he was coming and Defendant responded, "a girl's place." (Tr. 31:22-25, 32:1).  Defendant was then asked whether he would consent to a search of his vehicle.  Defendant responded that it was not his car. (Tr. 32:6-21).  Defendant was then placed in the back of Officer Border's vehicle where he was again asked whether he would permit a search of the vehicle.  This time, Defendant responded that it was his wife's car and that he could call his wife and the officers could ask her for permission.

After Defendant is placed in the back of the patrol car, the tape shows Detective Bates leaning into the driver's door to look inside the car.  He then peered into the window on the driver's side rear door.  Detective Bates testified that he saw the backpack while looking through the window. (Tr. 35:18-23).  Shortly thereafter, Detective Bates asked Defendant about the backpack and Defendant denied any knowledge of a backpack. (Tr. 36:8-20).  At approximately 12:48 p.m., the officers called for a K9 unit to respond in order to perform a drug sniff of the Expedition.

At approximately 1:00 p.m., the K9 unit arrived.  Officer Sullivan, the K9 handler, testified that when he arrived, he first met with Detective Bates to discuss the situation. (Tr. 111:17-23).  At approximately 1:07 p.m., the dog, Remington, began to perform the sniff.  Remington began at the front passenger-side headlight and proceeded to the

---

[4]  The tape actually indicates Defendant exited his vehicle at 13:44 p.m., however, Officer Border testified that he failed to change the time on the recorder to reflect daylight savings and therefore, the tape is off by one hour.  (Tr. 85:21-25, 86:1-3).

driver's side of the vehicle.  (Tr. 112:2-6).  Remington alerted (by scratching) at the front

driver's side door handle at 1:08 p.m.  After Remington alerted, Detective Bates began

a search of the vehicle and located the backpack he had seen Defendant carrying out of

the hotel.  Inside the backpack were 260 grams of cocaine and $18,400.00 in cash.  (Tr.

40:19-20).  Defendant was then placed under arrest and transported to the Narcotics

Unit.  After Defendant was arrested, Officer Border issued three traffic citations for

speeding, failing to wear a seatbelt and failure to change the address on his license

within ten days.  (Tr. 84:12-25, 85:1-5).

Later that evening, Detective Bates went to Defendant's home and asked

Defendant's wife for permission to search the house.  Defendant's wife gave her

consent and Detective Bates searched the master bedroom, the kitchen and the back

area of the house.  (Tr. 43:4-14).  There, he recovered several firearms.  (Tr. 44:2-19).

Defendant now seeks to suppress the cocaine, cash and firearms.

## II.  Argument

Defendant seeks to suppress evidence seized from his car during the traffic stop

on the grounds that: (1) the traffic stop was not lawful; (2) the subsequent detention and

questioning of Defendant was improper because the officers did not have any

reasonable suspicion to do so; (3) the arrival of the K9 unit and subsequent dog sniff

impermissibly extended the scope of the detention and (4) the seizure of the evidence

from the vehicle violated the Fourth Amendment because the officers did not have a

warrant and lacked probable cause to search the vehicle.  (Doc. 33, pp. 1-2).

Defendant also seeks to suppress the firearms retrieved from his home as fruits of the

poisonous tree.  (Doc. 33, p.14).  The Court will address each of these arguments

separately.

**A.  The Initial Stop of Defendant's Vehicle**

Traffic stops are seizures within the meaning of the Fourth Amendment.

Delaware v. Prouse, 440 U.S. 648, 653, 99 S.Ct. 1391 (1979).  Because traffic stops

are similar to investigative detentions, courts analyze their legality under the standards

set out in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868 (1968).  Under Terry, an officer's

actions during a traffic stop must be reasonably related in scope to the circumstances

justifying the stop.  See, e.g., United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir.

2001).  Further, the stop must be limited in duration "to the time necessary to effectuate

the purpose of the stop."  Id. (citing United States v. Pruitt, 174 F.3d 1215, 1219 (11th

Cir. 1999)).

In Whren v. United States, 517 U.S. 806, 116 S.Ct. 1769 (1996), a unanimous

Supreme Court held that if a traffic law was violated by the vehicle being stopped, the

police officer's subjective motivation for making the stop is irrelevant.  Thus, as long as

an objective police officer would have stopped the driver for a traffic violation, it does not

matter whether the officer subjectively wanted to investigate another offense.

Here, Defendant questions the propriety of the traffic stop based on Officer

Border's determination (via the pacing method) that Defendant was exceeding the

speed limit by a mere six miles per hour.  (Doc. 20, p.4).  Officer Border testified that he

utilized both his radar and his speedometer to determine Defendant was speeding.

Officer Border testified that his speedometer had been calibrated and that he had

personally checked his radar the morning of January 24, 2006.  (Tr. 71:20-24, 72:8-9).

Several courts have found probable cause where officers utilized the pacing method to

determine an individual was speeding.  See e.g., United States v. Letourneau, 944

F.Supp. 619, 622-23 (N.D. Ohio 1996) (officer had probable cause to stop vehicle when

pacing defendant's vehicle using calibrated speedometer and defendant had no idea

how fast he was going or the posted speed limit); Veney v. Ojeda, 321 F.Supp.2d 733,

(E.D. Va. 2004) (officer had objectively reasonable suspicion that vehicle speeding

when officer paced vehicle for one-third mile).  Accordingly, to the extent Defendant

challenges the officer's use of the pacing method as being unreliable, such is without

merit.

        In this case, Officer Border utilized both his speedometer and his radar to

determine Defendant's speed.  While the tape shows that Officer Border did not have

much time to pace Defendant, it also shows that while Officer Border was pacing him,

Defendant was slowing down; thus, indicating Defendant had been traveling at much

higher speeds.  It is also important to note that Defendant did not testify he was not

speeding.  Accordingly, Officer Border's testimony regarding Defendant's speed is

unrefuted.  Based on the videotape and the testimony of both Detective Bates and

Officer Border (which the Court finds credible), the undersigned finds Officer Border had

probable cause to believe Defendant was violating a traffic law by speeding and

therefore, the traffic stop itself was proper.

        In any event, as argued by the Government during the hearing, the officers had

the right to stop Defendant regardless of whether he violated any traffic laws under

Terry.  A brief investigative stop is permissible when an investigating officer has a

reasonable suspicion grounded in "specific and articulable facts" that the person

stopped is, is about to be, or has been involved in criminal activity.  Terry, 392 U.S. at

21, 88 S.Ct. at 1880.  Here, Detective Bates had a reasonable suspicion that Defendant

had engaged in a drug transaction at the hotel.  Through a confidential informant,

Detective Bates learned that Christopher Lowe was dealing cocaine.  Based on

information provided by the confidential informant, Detective Bates was able to seize

some of the cocaine sold by Mr. Lowe.  (Tr. 9:10-16).  The confidential informant told

Detective Bates numerous locations where Mr. Lowe received his cocaine and one of

these locations was the home of Defendant.  (Tr. 11:4-11).  Detective Bates also

personally observed Defendant enter a hotel room in which Mr. Lowe was located and

in which another known drug dealer, Lonnie Lewis, had recently entered.  (Tr. 13:5-23,

14:23-25, 15:1-10).  Finally, Detective Bates observed Defendant leave the hotel room

with a backpack.  (Tr. 17:3-8).  Detective Bates testified that in his thirteen years as a

detective in the Narcotics Division, he was aware that individuals engaged in drug

trafficking activity often put the drugs in backpacks or duffle bags.  (Tr. 20:1-25).  When

Defendant left the hotel, he began driving his car in a manner that led Detective Bates

to believe he was trying to avoid being followed.  (Tr. 19: 20-23).  The undersigned

believes all this is sufficient to establish a reasonable suspicion that Defendant was

engaged in criminal activity and therefore, an investigative stop was permitted

regardless of whether Defendant violated any traffic laws.

**B.  The Subsequent Detention of Defendant**

Defendant next argues that even if the Court finds the traffic stop reasonable, the evidence seized from his vehicle must be suppressed because "Mr. Tucker was impermissibly detained without reasonable suspicion to do so."  (Doc. 33, p.6).  As noted above, traffic stops are analyzed under the rules of Terry.  The Eleventh Circuit has determined:

> Under Terry, an officer's actions during a traffic stop must be reasonably related in *scope* to the circumstances which justified the interference in the first place.  Furthermore, the *duration* of the traffic stop must be limited to the time necessary to effectuate the purpose of the stop.  The traffic stop must not last any longer than necessary to process the traffic violation unless there is articulable suspicion of other illegal activity.

Purcell, 236 F.3d at 1277 (internal quotations and citations omitted) (emphasis in original).  In this case, Defendant challenges both the scope and duration of the detention.  The Government responds that the detention in this case was reasonable because the officers had reasonable suspicion to believe Defendant had been involved in illegal drug activity.

Defendant's argument is that he was stopped for a traffic violation and any questioning by the officers needed to be related to the traffic violation.  Additionally, Defendant appears to argue nothing occurred during the traffic stop that would have given the officers reasonable suspicion to believe he engaged in any unlawful conduct.  Defendant argues it was improper for the officers to ask him from where he was coming or about the backpack as neither were related to the traffic violation.  (Doc. 33, p.6-12).

The Government responds that the officers had reasonable suspicion at the time they stopped the vehicle to believe that Defendant had recently engaged in criminal activity and therefore, questioning Defendant about from where he was coming and about the backpack was appropriate.

The Court agrees with the Government that asking Defendant from where he was coming and about the backpack did not impermissibly exceed the scope of the stop.  As the Eighth Circuit held in United States v. Long, 320 F.3d 795, 800 (8th Cir. 2003):

> That the stop became investigative is not an issue--an investigative stop can grow out of a traffic stop so long as the officer has reasonable suspicion to expand his investigation, even if his suspicions are unrelated to the traffic offense that served as the basis for the stop.  At issue is whether the officers had the reasonable suspicion of criminal activity necessary to investigate further.

(internal citations omitted).  Likewise, in the instant case, it is not important that the traffic stop evolved into an investigative stop or began as an investigative stop so long as the officers had a reasonable suspicion to investigate further.  In determining whether reasonable suspicion exists, a reviewing court must look at the "totality of the circumstances" to see if the officer had a "'particularized and objective basis' for suspecting legal wrongdoing."  United States v. Arvizu, 534 U.S. 266, 273, 122 S.Ct. 744, 750 (2002) (quoting, United States v. Cortez, 449 U.S. 411, 417-18, 101 S.Ct. 690 (1981)).  "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'"  Arvizu, 534 U.S. at 273,

122 S.Ct. at 750-51 (quoting, <u>Cortez</u>, 449 U.S. at 418, 101 S.Ct. 690).  As noted in the previous section, the undersigned believes at the time the vehicle was stopped, Detective Bates had reasonable suspicion based on his thirteen years as a detective in the narcotics division of the Jacksonville Sheriff's Office to believe Defendant had engaged in criminal activity and that there were drugs in his vehicle.  Accordingly, the questioning of Defendant did not exceed the scope of the stop.

Next, the Court must determine if waiting for the canine team to perform the canine sniff of Defendant's vehicle impermissibly extended the duration of the stop. "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop."  <u>Florida v. Royer</u>, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325 (1983).  While there is "no hard-and-fast time limit" for a permissible <u>Terry</u> stop, in order to determine whether a detention is too long to be justified as an investigative stop, the Court must "examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant."  <u>United States v. Sharpe</u>, 470 U.S. 675, 686, 105 S.Ct. 1568, 1575 (1985).

Here, according to the videotape, Defendant was initially stopped at 12:44 p.m. and the dog alerted to the presence of drugs at 1:08 p.m., approximately twenty-four minutes after the stop.  The testimony of Officer Sullivan revealed that he was contacted by a dispatcher at 12:49 p.m. (Tr. 110:4-6), five minutes after Defendant was initially stopped, to respond to the scene of the stop.  Officer Sullivan testified that he was downtown at the time he received the call and he immediately responded and it took

him approximately eleven minutes to arrive at the scene.  (Tr. 110:21-23, 111:2-7).

Based on this testimony, the Court believes the officers diligently pursued a means of

investigation that was likely to confirm or dispel their suspicions quickly.  Accordingly,

the detention of Defendant in order to permit the K-9 unit to perform the sniff was

reasonable.

### C.  Search of the Vehicle

Defendant also argues that the search of his vehicle violated the Fourth

Amendment as the officers did not first obtain a search warrant nor did they have

probable cause to search the vehicle.  Defendant argues that the officers searched his

car three times.  Specifically, Defendant claims Detective Bates first searched the

vehicle prior to the arrival of the K-9 unit when he stuck his head into the driver's side

door and looked inside the car.  Defendant argues that the second time Detective Bates

searched the vehicle was again prior to the arrival of the K-9 unit when he peered into

the rear driver's side window.  (Doc. 33, p.12-13).  The third and final search occurred

when Detective Bates retrieved the backpack after the K-9 unit performed the dog sniff

of the vehicle.  The Government did not address the argument regarding the first two

searches in either its memorandum or at the hearing.

The Court can quickly dispense with Defendant's argument regarding the third

search.  Defendant argues the dog did not make a positive alert on the vehicle.  It

appears Defendant is arguing that although the dog alerted on the driver's door, it was

not a positive alert on the vehicle because the drugs were not located near the driver's

door.  (Doc. 33, pp. 13-14).  Officer Sullivan testified that the scent of drugs can come

out the door seams of a car and that once a dog alerts to the presence of drugs, it is not necessary to continue the sniff because it may unnecessarily damage the car.  (Tr. 113:3-13).  Accordingly, the fact that Remington alerted at the driver's side front door even though the drugs were located in the back seat is of no consequence.

Defendant admits that the use of the K9 sniff of the exterior of his car was lawful. (Doc. 33, p.13).  When Remington alerted to the presence of narcotics, the officers had probable cause to search the vehicle.  United States v. Dovali-Avila, 895 F.2d 206, 208 (5th Cir. 1990) (holding that when dog trained to alert upon detection of contraband alerts near a vehicle, that action alone is sufficient to give rise to probable cause to search the vehicle).  Accordingly, the Court is satisfied that when Remington alerted to the presence of narcotics in Defendant's vehicle, there was probable cause to conduct the search.  The more difficult issue is whether the first two searches violated the Fourth Amendment and if so, whether they so tainted the acquisition of the evidence that it must be excluded.

The video reveals that at approximately 12:45 p.m., Detective Bates leaned into Defendant's car and looked inside.  Shortly thereafter, Detective Bates looked into the driver's side rear window from the outside.  Defendant argues these were impermissible searches of the vehicle.

Officers may peer into a vehicle from the outside without violating the Fourth Amendment.  Texas v. Brown, 460 U.S. 730, 103 S.Ct. 1535 (1983) ("There is no legitimate expectation of privacy ... shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passerby or diligent

-14-

police officer."). Accordingly, the Court finds Detective Bates's act of peering into the car window from the outside did not constitute an unlawful search. The question of whether his leaning into the car constitutes a search is more difficult. The Supreme Court has held that "a car's interior as a whole is nonetheless subject to Fourth Amendment protection" and even a minor "intrusion in that space constitute[s] a 'search.'" New York v. Class, 475 U.S. 106, 114-15, 106 S.Ct. 960, 966 (1986). Thus, where an officer "could obtain the view only by leaning *into* the car," a search has occurred. W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment, § 2.5(c) (Fourth Edition 2004) (emphasis in original). In this case, Detective Bates leaned far into the car and looked around. As such, it appears Detective Bates conducted a search of Defendant's vehicle at that point. Assuming Detective Bates did not have probable cause to do so, this violated the Fourth Amendment.

What is not clear, however, is what if anything he saw while looking into the car. Detective Bates testified he was looking for the backpack that he already knew was in the vehicle. (Tr. 60:5-25, 61:1). Detective Bates testified that he did not see the backpack when he looked in the driver's door. (Tr. 60:22-25). Additionally, as Detective Bates peered into the car window after he had already leaned into the car, it is reasonable to assume he did not locate the backpack when he first leaned into the car.

"The exclusionary rule has traditionally barred from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion." Wong Sun v. United States, 371 U.S. 471, 484, 83 S.Ct. 407, 416 (1963). The exclusionary rule extends to evidence obtained through the exploitation of an earlier unlawful

invasion or "fruit of the poisonous tree."  Segura v. United States, 468 U.S. 796, 804,

104 S.Ct. 3380, 3385 (1984) (citing, Nardone v. United States, 308 U.S. 338, 341, 60

S.Ct. 266, 268 (1939)).  Evidence will not be excluded, however, if the connection

between the illegal police conduct and the discovery and seizure of the evidence is "'so

attenuated as to dissipate the taint.'"  Segura, 468 U.S. at 805, 104 S.Ct. at 3385

(quoting, Nardone, 308 U.S. at 341, 60 S.Ct. at 268).  Thus, evidence will not be

excluded if police discover the evidence from a source independent from the illegal

conduct.  Id.

In this case, the officers did not obtain the evidence as a result of Detective

Bates's first search.  Detective Bates did not even locate the backpack during this first

search.  Instead, the officers had an "independent source" of probable cause to search

the vehicle: the positive alert to narcotics by Remington.  United States v. Moore, 329

F.3d 399, 404-05 (5th Cir. 2003) (upholding denial of motion to suppress evidence

recovered from vehicle and noting that officers did not obtain evidence as a result of

illegal arrest but rather through "independent source" of dog sniff); United States v.

Harris, 1999 WL 133134 **2 (4th Cir. 1999) (upholding denial of motion to suppress

drugs located in car after illegal seizure and holding that "canine sniff provided the

requisite probable cause to obtain the search warrant and was an independent source

from the illegal seizure of the vehicle."); United States v. Bosby, 675 F.2d 1174, 1181

(11th Cir.  1982) (holding that detective's illegal search of briefcase did not taint

subsequent search by FBI agent pursuant to valid search warrant when search warrant

was based on information provided by defendants and did not contain any information

obtained through first, illegal search).  Accordingly, the evidence seized from the car should not be suppressed as its discovery was not the result of any illegal police activity but rather a lawful canine sniff.

Even if it is assumed that the canine sniff of the vehicle was a result of the exploitation of Detective Bates's allegedly unlawful search, the Court nevertheless cannot conclude that the cocaine and money in the backpack should be suppressed as fruit of the poisonous tree because Detective Bates had another lawful independent source for that search.  Because Detective Bates observed Defendant leave what he believed to be a drug deal and place the results of that transaction in his vehicle, probable cause existed to conclude that the vehicle itself was involved in an illegality, regardless of Detective Bates's first search.  The automobile exception to the warrant requirement permits law enforcement to seize and search an automobile without a warrant if "probable cause exists to believe it contains contraband."  Pennsylvania v. Labron, 518 U.S. 938, 940, 116 S.Ct. 2485, 2487 (1996).  While a seizure or search of property without a warrant ordinarily requires a showing of both probable cause and exigent circumstances, the "ready mobility" of automobiles permits their search based only on probable cause.  Id.; Maryland v. Dyson, 527 U.S. 465, 466-67, 119 S.Ct. 2013, 2014 (1999).  Given the events at the hotel observed by Detective Bates and the information he had previously learned from the confidential informant, probable cause existed to believe Defendant's vehicle contained contraband.  As such, when Defendant was first pulled over for the traffic stop, Defendant Bates had probable cause to search the vehicle immediately.  However, he waited until a K9 unit with drug sniffing ability

could be found to confirm what was already suspected to be true: that the vehicle contained contraband.  Following the dog's alert, Detective Bates conducted the search.  Accordingly, the Court believes it is not proper to suppress the evidence seized from Defendant's car.

### D.  Search of Defendant's Home

Finally, Defendant argues the firearms found at his home should be suppressed as fruit of the poisonous tree.  However, at the hearing, Detective Bates testified that when he arrived at Defendant's residence, he asked Defendant's wife for consent to search the home and she provided consent.  Defendant did not present any evidence to contradict this and therefore, the Court finds Detective Bates properly obtained consent to search the residence and the firearms should not be suppressed.

Accordingly, after due consideration, it is

**RECOMMENDED**:

Defendant's Amended Motion to Suppress Evidence (Doc. 33) be **DENIED**.


**DONE AND ENTERED** at Jacksonville, Florida this   12th   day of May, 2006.



*Monte C. Richardson*

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

-18-

Copies to:

The Honorable Harvey E. Schlesinger
United States District Judge

Counsel of Record